# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LINDA HERNANDEZ,<br>　　　Plaintiff, | | No. 3:17-cv-368 (SRU) |
| 　　　v. | | |
| NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br>　　　Defendant. | | |

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Linda Hernandez moves to reverse the decision by the Social Security Administration ("SSA") denying her claim for disability insurance benefits. Mot. to Reverse, Doc. No. 21. The Commissioner of Social Security moves to affirm the decision. Mot. to Affirm, Doc. No. 27. Although I conclude that most of Hernandez's arguments for reversal lack merit, I hold that the ALJ erred in failing to consider Hernandez's kidney stones in his analysis and, subsequently, erred in failing to include the limitation in his hypothetical questions to the vocational expert. Further, I hold that the ALJ erred in relying on the vocational expert's inadequate testimony regarding the number of jobs in the national economy that were available to Hernandez. As a result of the ALJ's reliance on that testimony, his finding that Hernandez had available to her a significant number of jobs in the national economy was not supported by substantial evidence. Therefore, I GRANT Hernandez's Motion to Reverse the Decision of the Commissioner (Doc. No. 21) and DENY the Commissioner's Motion to Affirm its Decision (Doc. No. 27).

## I. Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of

the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

Linda Hernandez filed for Social Security disability benefits and supplemental security income on October 1, 2013 alleging a period of disability from December 2, 2011. Int'l Disability Determination Explanation, R. at 70. At the time of the alleged onset of disability,

Hernandez was 40 years old. *Id*. Hernandez identified her disability as depression, back issue, clubbed feet, and high blood pressure. *Id*. The SSA initially denied her claim on March 27, 2014, finding that Hernandez's "condition result[ed] in some limitations in [her] ability to perform work related activities … [her] condition [was] not severe enough to keep [her] from working." *Id*. at 81. The SSA went on to say that they "considered the medical and other information and work experience in determining how [her] condition affect[ed her] ability to work." *Id*. Further, they stated they did not "have sufficient vocational information to determine whether [she] can perform any of [her] past relevant work." *Id*. In the agency's view, she could "adjust to other work." *Id*. At the time of the agency's denial, Hernandez was almost 43 years old. *Id*. at 70.

On April 8, 2014, Hernandez sought reconsideration of the agency's decision, alleging that her condition had "gotten worse since her last disability report was completed." Notice of Reconsideration, R. at 138; Reconsideration Explanation, R. at 95. The SSA again denied her claim on reconsideration on May 20, 2014, stating that her "condition is not severe enough to keep [her] from working" and that she can "adjust to other work." *Id*. at 107.

On June 2, 2014, Hernandez requested a hearing before an Administrative Law Judge; Hr'g Request, R. at 162; which was held on May 7, 2015. Tr. of ALJ Hr'g, R. at 45. At the hearing, ALJ Ronald Thomas questioned Hernandez about her conditions and treatment history, particularly asking questions regarding her capacity to perform daily working and living functions. *Id*. at 50-58. Hernandez testified that she had worked at Fair Haven Community Health Center for twelve years as a part time medical records clerk until she left in 2011 for health reasons. *Id*. at 50-51. She testified that she has club feet and uses a cane to walk, that she has back and hip pain because she has "one leg longer than the other … [and] one hip higher

than the other." *Id*. She testified that she last had surgery on her feet "in [her] early 20s" and doctors have told her "there's really nothing else they can do." *Id.* at 53-54. She also testified that she takes over-the-counter pain medication for her back pain and takes prescription medication for depression. *Id*. at 54. Additionally, she testified that she has kidney stones in both of her kidneys and has a "stent in both sides." *Id*. at 55.

Regarding her physical limitations, Hernandez testified that she cannot lift anything, Tr. of ALJ Hr'g, R. at 52; she does things around the house but has to "take [her] time," *id.* at 56; she has to take baths instead of showers because "it's hard for [her] to stand on [her] feet," *id.*; her live-in children do most of the housework so she doesn't have to "lift[] or bend[]," *id.*; she goes grocery shopping, *id.*; she does not drive or take public transportation, *id.* at 56-57; she does not go out much, does not travel, and has no hobbies. *Id.* at 57-58. Her non-attorney representative, Stephen Eby, asked her about her depression, and Hernandez testified that she has had depression since she was a child but that it is "worse now." *Id.* at 59. She testified that she was depressed that she was "born with club feet" and because she was "sexually molested [as a child] by a family member." *Id.* She testified that her depression makes it "hard for [her] to concentrate sometimes" and makes her "forget everything." *Id.* at 60. She also testified that she previously had a drinking problem but is "doing better now" and had been sober for about one year. *Id*. at 60-61.

The ALJ then heard testimony from John Matzilevich, a neutral vocational expert who testified that Hernandez was employed as a medical records clerk which is a "semi-skilled job" with a "light" exertion level. Tr. of ALJ Hr'g, R. at 62-63. The ALJ then asked Matzilevich to assume "an individual of [Hernandez's] age, education, and past relevant work experience, who is limited to [a] sedentary" exertion level, and that the individual "has a further limitation of

5

being unable to complete tasks from beginning to end on a consistent basis, and is unable to maintain competitive pace for more than 80 percent of the time in the work place." *Id*. at 63. In response, Matzilevich opined that "there would be no jobs" for that individual. *Id*. The ALJ then asked Matzilevich a separate hypothetical and to again assume "an individual of [Hernandez's] age, education, and past educational work experience, who is limited to [a] sedentary" exertion level, and who "needs the use of a cane to ambulate;" can "occasional[ly]" bend, squat, twist, climb, balance, kneel, and crawl; and can "occasional[ly] interact[] with coworkers, with the public, and with the supervisors." *Id*. at 63-64. Matzilevich opined that "there are other jobs" for that individual, other than the prior work Hernandez had done. *Id*. at 64. He offered three options: (1) "document preparer" with 28,291 national jobs and 207 in Connecticut; (2) "addressing clerk" with 12,456 national jobs and 105 in Connecticut; and (3) "trimmer, a press clipping" with 7,516 national jobs and 52 in Connecticut. *Id*. at 64-65.

On June 23, 2015, the ALJ issued an opinion in which he found that Hernandez was not "under a disability within the meaning of the Social Security Act from December 2, 2011, through the date of th[e] decision." ALJ Decision, R. at 9. At the first step, the ALJ found that Hernandez "ha[d] not engaged in substantial gainful activity since December 2, 2011, the alleged onset date." *Id*. at 11. At the second step, the ALJ determined that Hernandez's impairments of "bilateral club foot deformity; bilateral hammertoe deformity; depressive disorder; anxiety disorder; and alcohol abuse disorder in variable remission" were "severe impairments" that "impose[] more than a minimal limitation on [Hernandez's] ability to perform basic work activities." *Id*. The ALJ ruled that Hernandez's hip and back pain were not "medically determinable impairments" because there was "no evidence of any formal medical treatment or diagnostic evaluations for the … alleged hip and back pain" and were supported only by

Hernandez's "statement of symptoms." *Id.* at 11-12. Additionally, the ALJ ruled that Hernandez's history of alcohol abuse was "not a factor material to the determinations of disability" because although she reported "extensive alcohol abuse," she testified that "she had been sober for about one year" and "[t]he record [did] not indicate that her mental impairments were significantly worse or significantly improved based on her level of substance abuse." *Id.* at 12.

At the third step, the ALJ determined Hernandez "d[id] not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments[.]" ALJ Decision, R. at 12. Specifically, he stated that he considered the criteria for "dysfunction of a major joint" and opined that "[n]o treating or examining physician ha[d] proffered findings that [were] equivalent in severity" to major joint dysfunction. *Id.* Additionally, he stated that he considered "affective disorders" and "anxiety-related disorders" and found that Hernandez's "mental impairments, considered singly and in combination, d[id] not meet or medically equal" those listings. *Id.* He found that she had a "mild limitation" in activities of daily living, a "moderate limitation" in social functioning, a "mild limitation" in concentration, persistence, or pace, and has had "no episodes of decompensation." *Id.* at 12-13. Further, he found that "there [was] no evidence in the record to show that [Hernandez's] anxiety … resulted in a complete inability to function independently outside of her home." *Id.* at 13.

The ALJ then assessed Hernandez's residual functional capacity, and found that she could "perform sedentary work" with certain limitations. ALJ Decision, R. at 14. Those limitations were that Hernandez (1) "require[d] the use of a cane for ambulation," (2) "could occasionally bend, squat, twist, climb, balance, kneel, or crawl," and (3) "could occasionally interact with coworkers, supervisors, or the general public." *Id.* The ALJ stated that he

"considered all symptoms and the extent to which th[ose] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as "opinion evidence" in making his determination. *Id.* The ALJ cited numerous medical records, *id.* at 14-18, and concluded that Hernandez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Hernandez's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" *Id.* at 18. The ALJ discredited Hernandez's testimony regarding the severity of her limitations because "the objective medical evidence of record [was] not consistent with [Hernandez's] allegations regarding her physical and mental impairments …, the record [did] not indicate that [Hernandez had] made any persistent complaint of side effect from medication or that medical providers have seen a need to make any significant change in the type or dose of medication … [, and Hernandez had] reported a range of daily activities that are not generally consistent with her allegations of disabling physical and mental impairments." *Id.* at 19.

At the fourth step, the ALJ determined that Hernandez was "unable to perform any past relevant work." ALJ Decision, R. at 19. At the fifth step, the ALJ concluded that, based on Hernandez's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Hernandez] c[ould] perform." *Id.* at 20. The ALJ further stated that "[b]ased on the testimony of the vocational expert … [Hernandez was] capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 21. "A finding of 'not disabled' [was] therefore appropriate," and the ALJ denied Hernandez's request for disability benefits. *Id.* at 21.

Hernandez requested a review of the ALJ's decision by the SSA's Appeals Council on August 11, 2015. Request for Review of Hearing Decision/Order, R. at 5. Holding that there

was "no reason … to review the [ALJ]'s decision," the Appeals Council "denied [Hernandez's] request for review" on January 4, 2017. Notice of Appeals Council Action, R. at 1-4. Hernandez then filed a complaint before this court on March 2, 2017 urging reversal of the Commissioner's decision. Compl., Doc. No. 1. Hernandez filed a Motion to Reverse the Decision of the Commissioner on September 12, 2017. Mot. to Reverse, Doc. No. 21. The Commissioner filed a Motion to Affirm its decision on February 9, 2018. Mot. to Affirm, Doc. No. 27.

## III. Discussion

On review, Hernandez asserts that the ALJ's "findings are not supported by substantial evidence in the record as a whole and/or that the [ALJ]'s decision was not rendered in accordance with law. Mot. to Reverse, Doc. No. 21, at 1. Specifically, she contends: (1) that the ALJ failed to follow the treating physician rule, Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 15; (2) that the ALJ failed to develop the record, *id*. at 24; (3) that the ALJ failed to find that certain physical conditions were "severe impairments," *id.* at 29; (4) that the ALJ improperly evaluated Hernandez's claims of pain, *id*. at 31; and (5) that the ALJ's vocational analysis was defective, *id*. at 35. The Commissioner responds that "the ALJ's decision is supported by substantial evidence and is legally correct," and should therefore be affirmed. Mem. Supp. Mot. Affirm, Doc. No. 27, at 2.

### A. Did the ALJ fail to follow the treating physician rule?

Hernandez argues that the ALJ failed to follow the treating physician rule and gave "greater weight to the opinions of State Agency document reviewers" than Hernandez's treating physician. Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 16.

"The treating physician rule provides that an ALJ should defer 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in [the] case record."[1] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)).  When the ALJ gives controlling weight to a non-treating physician, and he does not give the treating source's opinion controlling weight, he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a[n] … opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned.  *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).  But "where the ALJ's reasoning and adherence to the regulation are clear," he need not "slavish[ly] recite[] each and every factor" listed in the regulations.  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order).  Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a

---

[1] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute … substantial evidence"). The question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians—Dr. Bernstein, Dr. Khan, Dr. Mongillo, Dr. Hanson, and Dr. Hill—more heavily than the opinion of Hernandez's treating physician—Dr. Anderson. *See Burgess*, 537 F.3d at 129.

With respect to Hernandez's physical impairments, the ALJ stated that he gave "some weight" to the assessments of Dr. Abraham Bernstein and Dr. Khurshid Khan, state non-examining physicians; "less weight" to the assessment of Dr. Sharon Anderson, Hernandez's treating physician; and "some weight"/"less weight" to the assessment of Dr. Frank Mongillo, a consultative examiner. ALJ Decision, R. at 18-19.

In Dr. Bernstein's report dated March 27, 2014, he opined that Hernandez could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for 3 hours; sit for 6 hours in an 8-hour workday; push and/or pull; occasionally climb ramps/stairs, ladders/ramps/scaffolds; occasionally stoop, kneel, crouch, and crawl; and frequently balance. Int'l Disability Determination Explanation, R. at 78. Dr. Bernstein opined that Hernandez could perform sedentary, unskilled work. *Id.* at 80. In his report dated May 29, 2014, Dr. Khan made the same findings as Dr. Bernstein regarding Hernandez's physical abilities. Reconsideration

Disability Determination Explanation, R. at 102-103. The ALJ stated that those assessments were "generally consistent with the objective record viewed as a whole" but also that he gave Hernandez's "subjective allegations the benefit of the doubt by accounting for a somewhat more restrictive range of abilities in the residual functional capacity assessment[.]" ALJ Decision, R. at 18.

On September 26, 2014, Dr. Anderson opined in a letter that Hernandez had a "fair prognosis" with respect to her "club foot deformity," depression, hypertension, and nephrolithiasis. Letter from Dr. Anderson, R. at 567. She further opined that Hernandez was "unable to walk or stand for long periods of time … [and] goes through episodes of worsened symptoms of depression" and, accordingly, Hernandez was "unable to work for a period of 6-12 months." *Id.* In a May 28, 2015 Disability Questionnaire, Dr. Anderson opined that Hernandez could sit for 6 hours per day; could stand/walk for 1 hour per day; could frequently lift/carry over 50 pounds; had no limitation using her hands and arms; had frequent "pain, fatigue, or other symptoms severe enough to interfere with [her] attention and concentration;" and was "likely to be absent from work as a result of [her] impairments or treatment … [m]ore than three times a month." Disability Questionnaire, R. at 648-651.

In giving "less weight" to Dr. Anderson's findings, the ALJ stated: (1) "the determination of disability is a matter reserved to the Commissioner" and Dr. Anderson's opinion that Hernandez could not work for six to twelve months was "not entitled to any significant weight;" (2) Dr. Anderson's "proffered physical limitations … are inconsistent with [Hernandez]'s conservative, effective treatment history" because "there is no evidence that her impairment has become exacerbated during the time period in question;" (3) Dr. Anderson's "proffered limitations are inconsistent with [Hernandez]'s reported activities of daily living;" and (4) Dr.

Anderson's "proffered limitations are inconsistent with [Hernandez]'s examination findings" because she "does not have a significant gait abnormality, and there is no evidence indicating that she would be nearly completely unable to walk with the assistance of a cane." ALJ Decision, R. at 18.

In his March 20, 2014 assessment, Dr. Mongillo opined that Hernandez had a "stiff gait" but "did not have any focal gait abnormalities." Determination Service Report, R. at 358. Further, he opined that she had "some difficulty walking or standing for prolonged periods of time" and had "some tenderness and spasm in her low back." *Id.* at 359. He determined that Hernandez "could do light or moderate work, certainly could do sedentary work but would have difficulty with extended periods of time on her feet." *Id.* The ALJ gave "some weight" to Dr. Mongillo's assessment to the extent that "it sets forth an ability to perform sedentary work activity that does not involve 'extended periods of time on her feet'" and "less weight" to Dr. Mongillo's assessment to the extent that it sets forth an ability to perform "light work activity." ALJ Decision, R. at 18. The ALJ opined that "a restriction to sedentary work activity with the use of an assistive device for walking or standing [was] more appropriate and more consistent with the evidence of record." *Id.* at 19.

With respect to Hernandez's mental impairments, the ALJ gave "some weight" to the assessments of Dr. Gregory Hanson and Dr. Thomas Hill, state non-examining physicians and "some weight" to the assessment of Dr. Anderson. *Id.*

In Dr. Hanson's March 17, 2014 assessment, he opined that Hernandez had "sustained concentration and persistence limitations" and that she was "moderately limited" in her ability to maintain attention and concentration for extended periods of time and in her ability to complete a normal workday/workweek without interruptions from "psychologically based symptoms" and

perform work at a "consistent pace without an unreasonable number and length of rest periods." Int'l Disability Determination Explanation, R. at 78-79. Further, Dr. Hanson opined that Hernandez was "not significantly limited" in the following abilities: carrying out "short and simple instructions;" carrying out detailed instructions; performing activities "within a schedule," maintaining "regular attendance," and being "punctual within customary tolerances;" sustaining an "ordinary routine without special supervision;" working "in coordination with or in proximity to others without being distracted by them;" and making "simple work-related decisions." *Id.* Dr. Hanson further opined that Hernandez had "social interaction limitations" and was "moderately limited" in her "ability to interact appropriately with the general public." *Id.* at 79. He opined that Hernandez was "not significantly limited" in the following abilities: asking "simple questions" or requesting assistance; accepting instructions and responding "appropriately to criticism from supervisors;" getting "along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and maintaining "socially appropriate behavior" and adhering to "basic standards of neatness and cleanliness." *Id.* Further, Dr. Hanson opined that Hernandez was "[n]ot well matched to busy public settings, but presents well, able to talk to others, ask questions, cooperate with authorities, [and] keep reasonable appearance." *Id.* Dr. Hanson found that Hernandez did not have "adaptive limitations." *Id.*

Dr. Hill, in his May 19, 2014 assessment, made the same findings as Dr. Hanson regarding Hernandez's sustained concentration and persistence limitations and social interaction limitations. Reconsideration Disability Determination Explanation, R. at 104-05. Dr. Hill, however, found that Hernandez had "adaptive limitations" and was "moderately limited" in her "ability to set realistic goals or make plans independently of others." *Id.* at 105. Dr. Hill found that Hernandez was "not significantly limited" in the following abilities: responding

"appropriately to changes in the work setting;" being aware of "normal hazards" and taking "appropriate precautions;" traveling "in unfamiliar places" or using public transportation. *Id.*

The ALJ stated that he concurred with the assessments of Dr. Hanson and Dr. Hill to the extent that the assessments "reflect a mild-to-moderate degree of overall mental limitations" but found that "a mild rather than a moderate degree of limitation in the domain of concentration, persistence, and pace [was] appropriate." ALJ Decision, R. at 19.

In a March 5, 2014 treatment note, Dr. Anderson opined that Hernandez's depression had "significant[ly] improved" since 2012 and that it was in remission. Treatment Note, R. at 344. She further opined that Hernandez's symptoms had "improved but [were] not resolved" with medication. *Id.* With respect to daily living activities, Dr. Anderson noted that Hernandez had "[n]o problem" "[t]aking care of personal hygiene," "[c]aring for physical needs (e.g. dressing, eating)," and "[u]sing good judgment regarding safety and dangerous circumstances," and had a "slight problem" "[u]sing appropriate coping skills to meet ordinary demands of a work environment" and "[h]andling frustration appropriately." *Id.* at 345. With respect to social interactions, Dr. Anderson noted that Hernandez had "[n]o problem" "[r]especting/responding appropriately to others in authority" and "[g]etting along with others without distracting them or exhibiting behavioral extremes," and had a "slight problem" "[i]nteracting appropriately with others in a work environment" and "[a]sking questions or requesting assistance." *Id.* at 346. With respect to task performances, Dr. Anderson noted that Hernandez had "[n]o problem" "[c]arrying out single-step [or multi-step] instructions," and "[c]hanging from one simple task to another," and had a "slight problem" "[f]ocusing long enough to finish assigned simple activities or tasks," "[p]erforming basic work activities at a reasonable pace/finishing on time," and "[p]erforming work activity on a sustained bases (i.e. 8 hours per day, 5 days a week)." *Id.*

The ALJ stated that he concurred with Dr. Anderson's assessment that Hernandez "experiences no more than a slight problem," that her depression was in remission, and that her substance abuse was "immaterial." ALJ Decision, R. at 19. The ALJ further concurred with Dr. Anderson's opinion to the extent that it "sets forth a generally mild-to-moderate degree of overall mental limitation." *Id.* He noted, however, that Dr. Anderson "is not a specialist in the area of psychiatric medicine" and, although he gave her opinion "some weight," he based his findings "on the record as a whole, including [Hernandez]'s treatment with psychiatric providers at the Yale New Haven facility." *Id.*

Hernandez argues, generally, that the ALJ should have given more weight to Dr. Anderson's findings, as her treating physician. She argues, more specifically, that the ALJ erred when he found that Dr. Anderson's opinion that Hernandez was not able to work for six to twelve months was "not entitled to any significant weight." Mem. in Supp. Mot. Reverse, Doc. No. 21-1, at 19. Additionally, Hernandez argues that the ALJ incorrectly assigned only "some weight" to Dr. Anderson's mental impairment assessment because Dr. Anderson was not a "specialist in the area of psychiatric medicine." *Id.* at 22.

With respect to Hernandez's general argument, that the ALJ should have given more weight to the treating physician's findings, I do not agree. The inconsistencies between the opinions of Dr. Anderson, on the one hand, and the opinions of other physicians, on the other, presented a "[g]enuine conflict[] in the medical evidence … for the Commissioner to resolve." *See Burgess*, 537 F.3d at 128. The Second Circuit has stated that where a treating physician's opinion is inconsistent with the record, those factors "constitute 'good reasons' for the limited weight attributed." *Camille v. Colvin*, 562 F. App'x 25, 27 (2d Cir. 2016) (summary order). Furthermore, even if "the record contains evidence" that might support Dr. Anderson's opinions

regarding Hernandez's limitations, it also "contains substantial evidence supporting the conclusion[s]" drawn by the other physicians and by the ALJ. *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 76 (2d Cir. 2012) (summary order). Because "[i]t is not [my] function to determine *de novo* whether [Hernandez] is disabled," *Brault*, 683 F.3d at 447, nor "to resolve evidentiary conflicts" in the record, *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), I see no error in the ALJ's decision not to give controlling weight to Dr. Anderson's opinions. For the same reasons, I conclude that—after he decided not to give Dr. Anderson's opinions controlling weight—the ALJ properly evaluated the persuasiveness of the opinions under the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision.'" *Chichocki*, 729 F.3d at 178 n.3. Here, the ALJ was sufficiently specific in writing that Dr. Anderson's opinions were "inconsistent" with Hernandez's "conservative, effective treatment history," with her "reported activities of daily living," and with her "examination findings." ALJ Decision, R. at 18.

Further, the ALJ did not err in determining that Dr. Anderson's opinion that Hernandez was not able to work for six to twelve months was "not entitled to any significant weight." *Id.* The regulations specifically state that physician's opinions that a claimant is "disabled" or "unable to work" are "issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d)(1). Further, the regulations state that the ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *Id.* at § 404.1527(d)(2). Accordingly, the ALJ did not err by not giving significant weight to Dr. Anderson's opinion that Hernandez could not work for six to twelve months.

Lastly, the ALJ did not err in assigning only "some weight" to Dr. Anderson's mental impairment assessment because Dr. Anderson was not a "specialist in the area of psychiatric medicine." ALJ Decision, R. at 19. Again, Hernandez's argument is not supported by the regulations, which state that the ALJ will "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to a medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Accordingly, the ALJ did not err in giving "some weight" to Dr. Anderson's psychiatric evaluation, and basing his opinion on the "record as a whole," including treatment with psychiatric specialists.

I affirm the ALJ with regard to his treatment of the doctors' medical opinions.

### B. Did the ALJ fail to develop the record?

Hernandez argues that the ALJ failed to develop the administrative record. Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 24. Specifically, she alleges that the administrative record fails to include a medical source statement by Dr. Francisco Lopez, who saw Hernandez twice for her mental health concerns. *Id.*

"[T]he ALJ, unlike a judge in a trial, must … affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citation omitted) (internal quotation marks omitted). It is not "per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Sanchez v. Colvin*, 2015 WL 736102, at *5 (S.D.N.Y. 2015). The Second Circuit has stated that medical reports submitted on behalf of the claimant "'*should* include … [a] statement about what [the claimant] can still do despite [the claimant's] impairment,' not that they *must* include such statements … [and] 'the lack of the medical source statement will not make the report incomplete." *Tankisi v.*

*Commissioner of Social Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (emphasis in original) (citing

20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)). "[W]here there are no obvious gaps in the

administrative record, and where the ALJ already possesses a 'complete medical history,' the

ALJ is under no obligation to seek additional information." *Pellam v. Astrue*, 508 F. App'x 87,

90 (2d Cir. 2013) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

The failure of the ALJ to procure formal opinions about a claimant's residual functional

capacity does not, by itself, require remand where the medical record is "quite extensive[,] …

voluminous[,] … [and] adequate to permit an informed finding by the ALJ." *Tankisi*, 521 F.

App'x at 34. "Remand is not always required when an ALJ fails in his duty to request opinions

particularly where … the record contains sufficient evidence from which an ALJ can assess the

petitioner's residual functional capacity." *Id.* That is particularly true where the record includes

assessments of the claimant's limitations from a treating physician. *Id.* Remand is required

where an ALJ's residual functional capacity decision is "wholly unsupported by any medical

evidence." *Jermyn v. Colvin*, 2015 WL 1298997, at *19 (E.D.N.Y Mar. 23, 2015). Additionally,

a claimant "must show that [she] was harmed by the alleged inadequacy of the record." *Santiago

v. Astrue*, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011).

Dr. Lopez treated Hernandez twice; once on April 30, 2014 and again on May 9, 2014.

April 30 Treatment Note of Dr. Lopez, R. at 559; May 9 Treatment Note of Dr. Lopez, R. at 564.

In his April 30 treatment notes, Dr. Lopez stated that Hernandez has "alcohol addiction" and

"life[-]long depression … largely resulting from childhood victimization, physical disability and

surgeries, as well as her stressful upbringing." April 30 Treatment Note of Dr. Lopez, R. at 562.

Dr. Lopez also notes that Hernandez reported experiencing "increased distress including anxiety"

and "over the last few years she feels there are too many days when she experiences lack of

motivation, anhedonia, insomnia, sadness with crying, and fatigue, even though she takes medication." *Id*. at 559. In his May 9 treatment notes, Dr. Lopez stated that Hernandez would "benefit from trauma[-]informed treatment focused on helping her cope with past negative experiences, treatment focused on increasing appropriate coping skills, and on assisting her [to] cope with her disability." May 9 Treatment Note of Dr. Lopez, R. at 564-565.

With respect to Hernandez's mental impairments, the ALJ found that Hernandez could "occasionally interact with coworkers, supervisors, or the general public." ALJ Decision, R. at 14. Further, the ALJ found that Hernandez's limitations were "mild" with respect to "concentration, persistence, and pace" and that her depression created only a "slight problem." *Id*. at 19. The ALJ stated that "the record reflects no evidence of psychiatric hospitalization, episodes of decompensation, or frank suicidal ideations. Instead, [Hernandez] has been able to manage the symptoms of her mental impairments with a conservative regimen of treatment, such as medication and therapy modalities." *Id*. The ALJ found that Hernandez had "only a mild-to-moderate degree of overall mental impairment," that she has had "significant improvement" with medication, and that her depression has been reported as "in remission." *Id*.

The record before the ALJ reflected that Hernandez's depression had "significantly improved" and was "in remission," and that Hernandez had, at worst, a "slight problem" with work-related functions. Dr. Anderson Treatment Note, R. at 344-46. Further, the record reflected that Hernandez was only "moderately limited" with respect to a number of work-related functions, but, on the whole, was "not significantly limited" in her ability to carry out work-related tasks. *See* Int'l Disability Determination Explanation, R. at 78-79. The record also reflects a treatment note from Dr. Jesus Lago, an agency mental-health consultative examiner, who documented that Hernandez herself complained that her "problem [was] physical," and that

she had "problems with [her] feet and [her] back." Dr. Lago Treatment Note, R. at 348. Further, Dr. Lago noted that it was difficult for Hernandez to work because of "her back pain and pain to her feet due to the clubbed feet" and her "renal stones." *Id.* at 348-349. Dr. Lago also noted that Hernandez said that she feels "she will be able to work from her mental health standpoint" but that her "physical problems prevent her from consistently attending work." *Id.* at 349. Further, Dr. Lago noted that she did "not have significant signs of depression" and that "[h]er social interactions with supervisors and coworkers in the past had been good." *Id.* at 350. Dr. Lago also noted that Hernandez is "capable of adapting to work setting" and "her [psychiatric] prognosis is very good." *Id.* at 351.

Accordingly, given the record the ALJ had before him, the ALJ's residual functional capacity decision regarding Hernandez's mental limitations is supported by the medical evidence in the extensive and voluminous record. There were no obvious gaps in the record, and therefore, the ALJ was under no obligation to seek additional information. *See Pellam*, 508 F. App'x at 90; *Tankisi*, 521 F. App'x at 34; *Jermyn*, 2015 WL 1298997, at *19.

C. Did the ALJ fail to find that certain physical conditions were "severe impairments?"

Hernandez argues, very briefly, that the ALJ erred in determining that her hip and back pain were not "medically determinable impairments."[2] Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 29. Additionally, Hernandez argues that the ALJ erred in not addressing her allegation of kidney stones in determining whether her impairments were "severe." *Id.*

---

[2] This argument, stated summarily in that section of Hernandez's brief, is essentially a re-argument of her claim that the ALJ improperly evaluated her claims of back and hip pain, which she briefed much more extensively. *See* Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 31-35. I discuss that argument fully below. *See* Section III(D) of this opinion. Accordingly, I will not re-state the discussion here.

At the second step of the process, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Here, Hernandez "bears the burden of presenting evidence establishing severity." *Baker v. Commissioner of Social Security*, 2016 WL 1446117, at *3 (N.D.N.Y. Mar. 22, 2016). Although the Second Circuit has held that this step is limited to 'screen[ing] out de minimis claims' … the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Id.* (quoting *Dixon v. Shalala*, 54 F. 3d 1019, 1030 (2d Cir. 1995), and *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). "The Regulations assure a claimant that the Social Security Administration will consider all of the evidence presented concerning a claimant's limitations when making a disability determination." *Warren v. Astrue*, 2010 WL 2998679, at *3 (W.D.N.Y. July 27, 2010).

In this case, Hernandez testified that she had kidney stones and was fired from her previous job because she "was missing a lot of work due to [her] … severe kidney stones in both" kidneys, for which she now has stents. Tr. of ALJ Hr'g, R. at 55. The record reflected a treatment note from Dr. Mongillo that Hernandez complained of her kidney stones on March 20, 2014 and cited that impairment as part of the reason she could not work. Dr. Mongillo Treatment Note, R. at 358. Hernandez did not list "kidney stones" in her disability benefits application, Int'l Disability Determination Explanation, R. at 70; or in her request for reconsideration, Notice of Reconsideration, R. at 138, Reconsideration Explanation, R. at 95; however, her representative listed in his brief her medical treatment and "history of kidney stones." Representative Brief, R. at 287-89.

At the step two analysis, the ALJ concluded that Hernandez had multiple severe impairments: "bilateral club foot deformity; bilateral hammertoe deformity; depressive disorder; anxiety disorder; and alcohol abuse disorder." ALJ Decision, R. at 11. The ALJ further found that Hernandez's "hip and back pain" were "not medically determinable impairments," but did not mention her kidney stones. ALJ Decision, R. at 11-12.

In making his step two determination, however, the ALJ should have considered Hernandez's kidney stones and made a determination concerning the severity of the impairment and its impact on her physical and mental ability to perform basic work activities. Both the record that the ALJ had before him and Hernandez's hearing testimony made reference to Hernandez's kidney stones as a contributing factor to her inability to work; *see* Dr. Mongillo Treatment Note, R. at 358; Tr. of ALJ Hr'g, R. at 55; and provided ample documentation about her medical treatment of the impairment over the years. Medical Report, R. at 383-550. This was clearly a "documented ailment" and the failure to mention it in the step two analysis, "let alone state a conclusion regarding its severity," was legal error. *See Warren*, 2010 WL 2998679, at *3.

The Commissioner argues that any failure by the ALJ at step two was harmless because the ALJ found that Hernandez had severe impairments and "proceeded past Step 2, and, when formulating the [residual functional capacity] finding, considered, inter alia, Ms. Hernandez's testimony … and the medical-evidence and medical-assessments … that contained Ms. Hernandez's complaints of kidney stones[.]" Mem. Supp. Mot. Affirm, Doc. No. 27, at 15. I do not agree. The Commissioner cites *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order), as support for the proposition that any error was harmless. Mem. Supp. Mot. Affirm, Doc. No. 27, at 14-15. There, the claimant argued that the "ALJ's step two

analysis was deficient because the ALJ excluded her anxiety disorder and panic disorder from his review." *Reices-Colon v. Astrue*, 523 F. App'x at 798. The Second Circuit held that the claimant had failed to preserve the claim for review, but went on to state that "[e]ven if [the] argument had not been waived, any error would be harmless. At step two, the ALJ identified other 'severe impairments' … and therefore proceeded with the subsequent steps. And, in those subsequent steps, the ALJ specifically considered [the claimant's] anxiety and panic attacks. Because these conditions were considered during the subsequent steps, any error was harmless." *Id*. Accordingly, the harmless error analysis here does not depend only on whether the ALJ continued beyond step two, but also on whether the ALJ nonetheless considered in subsequent steps the conditions he failed to discuss in step two. *Id.; see also Hall v. Colvin*, 2014 WL 411543, at *2 (N.D.N.Y. Feb. 3, 2014) ("The omission of an impairment at step two may be deemed harmless error, particularly where the disability analysis continues and the ALJ later considers the impairment in his RFC determination."); *Tryon v. Astrue*, 2012 WL 398952, at *4 (N.D.N.Y. Feb. 7, 2012) ("The ALJ's omission of [neck and right arm] impairments at Step Two of the analysis amount[ed] to no more than 'harmless error' because the ALJ continued with the sequential analysis. In the remaining steps, the ALJ discussed all of [the claimant's] medical treatment and considered [the claimant's] neck and right arm impairments in determining [claimant's residual functional capacity].").[3]

Here, the ALJ did not consider Hernandez's kidney stones in any meaningful way in his analysis at subsequent steps and in determining her residual functional capacity. In determining

---

[3]At least one court in the Second Circuit has held that, regardless of the ALJ's analysis in subsequent steps, the failure of an ALJ to even mention a "documented ailment presented by a treating physician," let alone state a conclusion regarding its severity, was reversible legal error. *Warren v. Astrue*, 2010 WL 2998679, at *3 (W.D.N.Y. July 27, 2010). The majority of case law, though, including that from the Second Circuit Court of Appeals, seems to focus more on whether the ALJ nonetheless considered the impairments in subsequent steps. Accordingly, I follow that line of reasoning here.

Hernandez's residual functional capacity, the ALJ lays out a relatively comprehensive history of her medical treatment. Although he notes one procedure for her kidney stones, ALJ Decision, R. at 15 (referencing Medical Report, R. at 383-550), he omits the condition in the remainder of his analysis. Notably, in his recitation of Hernandez's medical history, the ALJ references a March 20, 2014 examination with Dr. Mongillo in which the ALJ states that Hernandez "indicated that she had been unable to keep up with her previous job due to back and foot pain." ALJ Decision, R. at 16 (referencing Dr. Mongillo Treatment Note, R. at 358). The treatment note, however, goes beyond that and states that Hernandez "also complains of kidney stones" and notes that she stopped working "because of increased difficulty with walking and pain in her feet *and she miss[ed] a great deal of work because of her kidney stones*." Dr. Mongillo Treatment Note, R. at 358 (emphasis added). The ALJ also provided in his decision an overview of Hernandez's hearing testimony, in which he omits completely any mention of her kidney stones. ALJ Decision, R. at 17-18. As noted, Hernandez testified she had kidney stones and was fired from her previous job because she "was missing a lot of work due to [her] … severe kidney stones in both" kidneys, for which she now has stents. Tr. of ALJ Hr'g, R. at 55. These striking omissions lead me to conclude that the ALJ did not consider Hernandez's kidney stones in his analysis of the remaining steps, and, accordingly, his failure to do so was harmful error.

D. Did the ALJ improperly evaluate Hernandez's claims of pain?

Hernandez argues that the ALJ improperly discredited Hernandez's credibility regarding her claims of back and hip pain. Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 31. The Commissioner asserts that it was within the ALJ's discretion to discredit Hernandez's subjective accounts of pain, and, even still, the ALJ's residual functional capacity assessment comported

with the evidence regarding Hernandez's pain limitations. Mem. Supp. Mot. Affirm, Doc. No. 27, at 16-18.

It is the ALJ's role, and not mine, "'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki*, 534 F. App'x at 75 (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). Per the Social Security regulations, Hernandez's subjective statements about her pain, taken alone, are not sufficient for an ALJ to make a disability finding. 20 C.F.R. § 416.929(a). An ALJ must employ a two-step process for evaluating symptoms, such as pain. "First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's" pain. *Cichocki*, 534 F. App'x at 75. An ALJ must consider all of the claimant's "symptoms, including pain, and the extent to which [her] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). The ALJ "will consider all of [a claimant's] statements about [her] symptoms, such as pain, and any description [her] medical sources or nonmedical sources may provide about how the symptoms affect [her] activities of daily living and [her] ability to work." *Id.* An ALJ must have "objective medical evidence from an acceptable medical source" that shows that a claimant has a medical impairment or impairments that "could reasonably be expected to produce the pain or other symptoms alleged." *Id*.

If the ALJ finds that the first step is met, then he must "'evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki*, 534 F. App'x at 75 (citing 20 C.F.R. § 416.929(c)(2). In doing so, the ALJ considers "all of the available evidence" from medical and

nonmedical sources, including objective medical evidence but will not reject a claimant's

subjective assessment of the intensity and persistence of her pain "solely because the available

objective medical evidence does not substantiate [her] statements." 20 C.F.R. §§ 416.929(c)(1),

(2). "However, if a claimant's statements about [her] symptoms are not substantiated by the

objective medical evidence, the ALJ must consider the other evidence and make a finding on the

credibility of the individual's statements." *Cichocki*, 534 F. App'x at 76 (citing *Social Security

Ruling 96-7p*, 1996 WL 374186, at *4 (July 2, 1996)). In doing so, the ALJ should consider the

following factors: daily activities; "[t]he location, duration, frequency, and intensity" of the pain;

"[p]recipitating and aggravating factors;" "[t]he type, dosage, effectiveness, and side effects of

any medication" taken to alleviate pain; "[t]reatment, other than medication" received for pain

relief; measures used to relieve pain; and "[o]ther factors concerning … functional limitations

and restrictions due to pain[.]" 20 C.F.R. § 416.929(c)(3). Further, an ALJ will consider a

claimant's subjective claims of pain "in relation to the objective medical evidence and other

evidence, in reaching a conclusion as to whether [she is] disabled" and will consider "whether

there are any inconsistencies in the evidence and the extent to which there are any conflicts"

between the claimant's subjective claims of pain and the "rest of the evidence" including the

claimant's history, laboratory findings, and medical source statements regarding pain. 20 C.F.R.

§ 416.929(c)(4). If an ALJ determines that a claimant does have severe impairments, but the

impairments do not meet or equal a listed impairment, then the ALJ "will consider the impact" of

the claimant's impairment or impairments and related pain on the claimant's residual functional

capacity. 20 C.F.R. § 416.929(d)(4).

"The ALJ's decision 'must contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be sufficiently specific to make clear to

the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'" *Cichocki*, 534 F. App'x at 76 (citing *Social Security Ruling 96-7p*, 1996 WL 374186, at *2)). In making such a determination, the ALJ must provide more than just "a single, conclusory statement" regarding the claimant's credibility or a recitation of the relevant factors, but "remand is not required where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id.* (citing *Mongeur*, 722 F.2d at 1040).

Here, the ALJ concluded that Hernandez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but declined to credit Hernandez's testimony regarding the "intensity, persistence, and limiting effects of [those] symptoms." ALJ Decision, R. at 18. The ALJ found first that "the objective medical evidence of record [was] not consistent with [Hernandez's] allegations regarding her physical and mental impairments." *Id.* at 19. With respect to Hernandez's physical limitations, the ALJ noted that she had "not undergone surgical intervention since her twenties, nor has she required any long-term hospitalizations due to her alleged physical impairments" but had been treating her impairments which was "generally conservative and effective." *Id.* The ALJ next opined that the record did not reflect that Hernandez had "made any persistent complaint of side effect from medication or that medical providers [had] seen a need to make any significant change in the type or dose of medication." *Id.* And third, the ALJ noted that Hernandez's medical complaints were inconsistent with her reported range of daily activities. *Id.* The record reflected that Hernandez "was able to watch television, feed her pets, prepare simple meals, wash dishes, sweep, do light dusting, drive an automobile 'at times,' shop for groceries, spend time with family, and attend her medical appointments." *Id.* at 20 (citing Activities of Daily Living, R. at 245-52). Further,

the record reflected that Hernandez later reported that she could "cook, clean, do chores, use a computer, and attend to personal care tasks." *Id.* (referencing Dr. Lago Psychiatric Summary, R. at 348-57). The ALJ noted that Hernandez had, at times, reported more limited daily activities, but found that her overall allegations regarding her activities weighed against finding her disabled for two reasons: "First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if [Hernandez's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Hernandez's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." *Id.*

Although the ALJ did not discuss all seven factors listed in 20 C.F.R. § 416.929(c)(3), he provided specific reasons for his credibility determination, including that Hernandez's subjective allegations were not corroborated by her reported daily activities or the objective medical evidence, namely, her treatment and medication history. It is the ALJ's role to determine credibility issues, and, here, his decision was "sufficiently specific" in making clear the reasoning for his finding regarding Hernandez's credibility. *Cichocki*, 534 F. App'x at 75-76. Accordingly, the ALJ did not err in his decision to assign little weight to Hernandez's testimony.

E. Did the ALJ err in his vocational analysis?

Hernandez argues that the ALJ's vocational analysis was defective because the vocational expert "provided no information as to the methodology he used to generate national or regional job incidence data." *Id.* at 36. Further, Hernandez argues that, even if the vocational expert's methodology was correctly identified, the analysis itself was defective because there were "not a significant number of jobs existing in the national economy." Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 35. Lastly, Hernandez argues that the ALJ's hypothetical question to

the vocational expert was "defective, as it included no limitations whatsoever resulting from Hernandez's depressive disorder and anxiety disorder." *Id.* at 39.

1. *Did the ALJ err in accepting the vocational expert's testimony even though the expert "provided no information as to the methodology" used?*

Hernandez argues that the vocational expert "provided no information as to the methodology he used to generate national or regional job incidence data;" Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 36; and, therefore, it was reversible error for the ALJ to rely on that testimony. I agree.

After a claimant has proved that his or her residual functional capacity precludes a return to "past relevant work;" *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)), there is a "limited burden shift" to the Commissioner to show that "there is work in the national economy that the claimant can do." *Poupore*, 566 F.3d at 306. The ALJ may carry that burden "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).

"[A] vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." *McIntyre*, 758 F.3d at 152. When a vocational expert's testimony is given "on the basis of the expert's professional experience and clinical judgment" and is not "undermined by any evidence in the record," he is "not required to articulate a more specific basis for his opinion," and an ALJ can "reasonably credit" the expert's testimony. *Id.* "Occupation evidence provided by a [vocational expert] … should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles] …. [A]s part of the [ALJ]'s duty to fully develop the record, the [ALJ] will inquire, on the record, as to wither or not there is such consistency." *Social Security Ruling 00-4p*, 2000 WL 1898704 (Dec. 4, 2000). ALJs "rely primarily" on the Dictionary of Occupational

Titles in making disability determinations. *Id.*; 20 C.F.R. § 404.1566. The Dictionary of Occupational Titles ("DOT") is a publication by Department of Labor that "gives a job type a specific code … and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." *Brault*, 683 F.3d at 446. The DOT provides information to the vocational expert, and ALJ, that is useful in determining "the type of work a disability applicant can perform." *Id.* "The DOT, however, just *defines* jobs. It does not report how many such jobs are available in the economy." *Id.* (emphasis in original). In order to provide information regarding the availability of the jobs listed in the DOT, the vocational expert must turn to other sources, such as the Occupational Employment Quarterly. *Id.*

District Courts in the Second Circuit "follow the 'Seventh Circuit['s] approach [of requiring some evidentiary basis to rely up[on] the opinions of the [vocational expert.]'" *Koutrakos*, 2015 WL 1190100, at *20 (citing *Wages v. Comm'r of Soc. Sec.*, 2013 WL 3243116, at *6 (D. Conn. June 26, 2013)). An ALJ does not err when he relies on vocational expert's testimony that is based on personal experience, labor market surveys, and published statistical sources in determining the number of jobs available. *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013). It is enough for a vocational expert to identify "'the sources he generally consulted to determine'" the availability of jobs, even if he does not provide "specific information." *Brault*, 683 F.3d at 450 (citing *Galiotti v. Astrue*, 266 F. App'x 66 (2d Cir. 2008) (summary order)).

Here, the vocational expert, Matzilevich, testified regarding the type of jobs that Hernandez was capable of holding, given her physical and mental limitations, as posed by the

ALJ in the hypothetical questions.[4] Tr. of ALJ Hr'g, R. at 63-65. He testified that he referenced the DOT in compiling the list of jobs and that his testimony was "consistent with" the DOT. *Id.* at 65. He then went on to specify the number of available jobs, both locally and nationally, for each listed position. *Id.* at 64-65. He did not, however, identify any other publications or sources that he used in coming to such a determination. *Id.* He mentioned only the DOT which simply defines jobs, and does not provide information regarding the number available. By failing to identify any sources that he consulted, even generally, in determining the availability of jobs, the vocational expert's testimony did not comport with the Second Circuit's standard that he cite the sources used in coming to such a determination. Matzilevich did not cite a single other source upon which he could have relied, and the ALJ did not ask him how he came to such a conclusion. The ALJ merely asked if his opinion was consistent with the DOT, Tr. of ALJ Hr'g, R. at 65, which may be a sufficient basis for the vocational expert's opinion regarding the *types* of jobs available to Hernandez, but not regarding the *number*. Accordingly, Matzilevich's testimony was inadequate.

Of course, "agency errors do not always warrant remand," and in a different context, the Second Circuit has held that remand of an administrative appeal is "futile (a) when the [ALJ] articulates an alternative and sufficient basis for [his] determination; (b) when [his] reliance on the erroneous aspect of [his] reasoning is substantially tangential to [his] non-erroneous findings; or (c) when overwhelming evidence in the record makes it clear that the same decision is inevitable." *Zhong v. U.S. Dept' of Justice*, 480 F.3d 104, 117 (2d Cir. 2006); *see also McIntyre*, 758 F.3d at 148 (applying harmless error analysis to Social Security appeal). None of those

---

[4] For the reasons stated in Section III(C) and III(E)(3), Matzilevich's testimony regarding the jobs Hernandez was capable of holding may also have been improper because the opinion relied on the ALJ's hypothetical which erroneously left out Hernandez's kidney stones as a possible physical limitation.

exceptions applies here.  The ALJ explicitly stated that he relied on the vocational expert's testimony regarding the available number of jobs in the local and national economy in deciding whether there were sufficient jobs in the national economy that Hernandez would be able to perform.  Tr. of ALJ Hr'g, R. at 21.  Far from the ALJ "articulat[ing] an alternative and sufficient basis for [his] determination," or "overwhelming evidence in the record mak[ing] it clear that the same decision is inevitable," *Zhong*, 480 F.3d at 117, the vocational expert's inadequate testimony was the only evidence in the record that supported the ALJ's findings that there were jobs that Hernandez could perform that existed in sufficient numbers in the national economy.  Further, the ALJ's error was not "tangential."  *Id.*  The mistake was essential to the ALJ's finding that Hernandez was "not disabled" because there was other work that she could perform that existed "in significant numbers in the national economy," ALJ Decision, R. at 21— a step of the disability determination on which the Commissioner bore the burden of proof.  *See Poupore*, 566 F.3d at 306.

The ALJ's finding that Hernandez had available to her a "significant number" of jobs that she could perform is not "overwhelmingly supported by the record." ALJ Decision, R. at 21.  To the contrary, the ALJ's conclusion was supported only by the opinion of the vocational expert, given with no reference to any supporting sources.  Because no other evidence supports the ALJ's determination with regard to the number of jobs available to Hernandez, his finding of "not disabled" is "not supported by substantial evidence in the record," and must be remanded. *See Greek*, 802 F.3d at 374-75.

2.  *Did the ALJ err in accepting the vocational expert's testimony that there were "a significant number of jobs existing in the national economy?"*

Hernandez argues next that, even if the vocational expert's methodology was correctly identified, the ALJ's determination was wrong because there were "not a significant number of

jobs existing in the national economy" that Hernandez could perform.  Mem. Supp. Mot.

Reverse, Doc. No. 21-1, at 35.  As discussed above, I find that the ALJ's testimony regarding the

number of jobs available in the national economy was inadequate and, therefore, the ALJ erred

in relying upon it.  I note in this section, however, that if the vocational expert *had* adequately

cited sources for his opinion, the number of jobs available would have been sufficient to support

the ALJ's determination that there were a significant number of jobs available to Hernandez.

"The Commissioner has the burden in step five of the disability determination to prove

that the claimant is capable of working."  *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir.

2011).  At the fifth stage of the disability analysis, the ALJ must determine "based on the

claimant's residual functional capacity," whether the claimant can do "other work existing in

significant numbers in the national economy."  *Greek*, 802 F.3d 373 n.2 (citing 20 C.F.R. §§

404.1520(g), 404.1560(b)).  "Work exists in the national economy when there is a significant

number of jobs (in one or more occupations) having requirements which [the claimant is] able to

meet with [her] physical or mental abilities and vocational qualifications."  20 C.F.R. §

404.1566(b).[5]  It is insufficient to meet this level if there are only "[i]solated jobs that exist only

in very limited numbers in relatively few locations outside of the region where" the claimant

lives.  *Id*.

"Courts have held that a 'significant number' of jobs is 'fairly minimal;'" *Hamilton v.

Commissioner of Social Sec.*, 105 F. Supp. 3d at 229 (citing *Rosa v. Colvin*, 2013 WL 1292145,

---

[5] A single type of job is sufficient to satisfy this standard so long as it exists in significant numbers.  *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (in order to satisfy its burden at step five, the Commissioner "need show only one job existing in the national economy that [the claimant] can perform"); *Hamilton v. Commissioner of Social Sec.*, 105 F. Supp. 3d 223, 229-30 (N.D.N.Y. May 13, 2015) ("the court in *Bavaro* held that the Commissioner need only show that [the claimant] could perform one type of job"); *Sullivan v. Astrue*, 2009 WL 1347035, at *15 & n.15 (W.D.N.Y. May 13, 2009).

at *9 (N.D.N.Y. Mar. 27, 2013)); but "[n]either the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a 'significant' number of jobs." *Koutrakos v. Colvin*, 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2015) (recommended ruling).

"Within the Second Circuit, 'courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers.'" *Id.* (citing *Barbato v. Astrue*, 2010 WL 2710521, at *7 (W.D.N.Y. July 7, 2010)). But, "[c]ourts have adopted a relatively low threshold number." *Barbato*, 2010 WL 2710521, at *7; see *Koutrakos*, 2015 WL 1190100, at *22 (1,296 positions in the Connecticut and 152,000 positions nationwide were significant numbers); *Durante*, 2014 WL 4843684, at *5 (620 positions in Connecticut and 650,000 positions nationwide were significant numbers); *Dugan v. Soc. Sec. Admin, Comm'r*, 501 F. App'x 24, 25 (2d Cir. 2012) (noting vocational expert's testimony identifying 600 positions in the local Vermont economy and 344,000 nationwide); *Flores v. Astrue*, 2010 WL 5129121, at *10, 15 (D. Conn. Sept. 24, 2010) (affirming the ALJ's findings among which was the identification of a significant number of jobs available with 3,600 positions within the region and 380,000 positions nationwide), *approved and adopted over objection*, 2010 WL 5129110 (D. Conn. Dec. 9, 2010); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983) (affirming the district court's affirmance of the ALJ's findings among which was the finding that 150 positions in the regional economy and 112,000 positions nationwide were significant numbers); *Fox v. Commissioner of Social Sec.*, 2009 WL 367682, at *3 (N.D.N.Y. Feb. 13, 2009) (200 positions within the region and 132,980 positions nationwide were substantial numbers).

In looking at nationwide positions available, courts in this District have routinely held that numbers below 30,000 are sufficient to satisfy the "significant number" threshold. *Consiglio v. Berryhill*, 2018 WL 1046315, at *8 (D. Conn. Feb. 26, 2018) (finding 26,400 jobs in

the national economy to be significant even if the number of jobs in the local economy, 240, was not); *Lillis v. Colvin*, 2017 WL 784949, at *6 (D. Conn. Mar. 1, 2017) (finding 16,770 jobs in the national economy to be significant); *Gilmore v. Comm'r of Soc. Sec.*, 2016 WL 4079525, at *6 (N.D.N.Y. July 29, 2016) (finding 20,620 jobs in the national economy to be significant); *Gray v. Colvin*, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (finding "over 16,000" jobs in the national economy to be significant); *Daniels v. Astrue*, 2012 WL 1415322, at *17 (S.D.N.Y. Apr. 18, 2012) (finding 25,000 jobs in the national economy to be significant).

There seems to be some disagreement in the District regarding whether it is the number of local jobs that matter to this inquiry, or the number of nationwide jobs that matter. In *Consiglio*, the court found that a significant number of jobs nationwide was sufficient to satisfy the burden, even if the number of jobs in the local economy was not significant. *Consiglio*, 2018 WL 1046315, at *8 ("the number of jobs available in the local economy is not relevant, because the ALJ determined plaintiff could have performed a significant number of jobs in the national economy"). Whereas in *Durante*, the court stated that "[t]he proper geographic baseline … is neither the state nor the nation, but 'the region where [the claimant lives] or in several regions of the country." *Durante v. Colvin*, 2014 WL 4843684, at *5 (D. Conn. Sept. 29, 2014) (citing 42 U.S.C. § 423(d)(2)). I note that the language of the relevant Social Security regulation is fairly ambiguous in providing an answer to this question. *See* 20 C.F.R. § 404.1560(c)(2) ("Any other work (jobs) that [the claimant] can adjust to must exist in significant numbers in the national economy (either in the region where [she] lives or in several regions in the country)"). It does not matter here, however, whether the relevant inquiry is the nationwide numbers or the local numbers, because both meet the "significant numbers" threshold.

Here, the ALJ adopted the vocational expert's testimony, albeit erroneously, that Hernandez could perform the following jobs: document preparer, with 207 jobs in Connecticut and 28,291 nationwide; addressing clerk, with 105 jobs in Connecticut and 12,486 nationwide; or press clipper, with 32 jobs in Connecticut and 7,516 nationwide.  ALJ Decision, R. at 21.  In total, then, Hernandez theoretically had available to her 344 jobs in Connecticut and 48,293 nationwide.  As is customary, I look to other decisions in the Second Circuit for guidance in determining whether those numbers are significant.  In so doing, I determined that courts have found fewer than 48,293 jobs in the national economy to constitute a significant number.  *See, e.g.*, *Consiglio*, 2018 WL 1046315, at *8 (26,400 jobs); *Lillis*, 2017 WL 784949, at *6 (16,770 jobs); *Gilmore*, 2016 WL 4079525, at *6 (20,620 jobs); *Daniels*, 2012 WL 1415322, at *17 (25,000 jobs).  With respect to local numbers, courts have found fewer than 344 jobs in the local economy to constitute a significant number.  *See, e.g., Dumas*, 712 F.2d at 1553-54 (150 jobs); *Fox*, 2009 WL 367682, at *3 (200 jobs).  Accordingly, had the ALJ adequately identified the sources used in determining the number of available jobs, *see* Section III(E)(1) of this opinion, the ALJ would have been entitled to find that Hernandez had available to her other work that existed in significant numbers in the national economy.

3.  *Was the ALJ's hypothetical question defective?*

Lastly, Hernandez argues that the ALJ's hypothetical question to the vocational expert was "defective, as it included no limitations whatsoever resulting from Hernandez's depressive disorder and anxiety disorder."  Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 39.

If the ALJ asks a vocational expert a hypothetical question, in order for the expert's testimony "to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations … supported by the record."  *Horbock v. Barnhart*, 210 F. Supp. 2d 125,

134 (D. Conn. 2002) (quoting *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995)). If the ALJ "ask[s] the vocational expert a hypothetical question that fail[s] to include or otherwise implicitly account for all of [the claimant]'s impairments," then "the vocational expert's testimony is not 'substantial evidence' and cannot support the ALJ's conclusion that [the claimant] c[an] perform significant numbers of jobs in the national economy." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011); *see also Lancaster v. Comm'r of Soc. Sec.*, 228 F. App'x 563, 573 (6th Cir. 2007) (unpublished) ("If the hypothetical question does not accurately portray Plaintiff's physical and mental state, [then] the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work"); *Medovich v. Colvin*, 2015 WL 1310310, at *14 (N.D.N.Y. Mar. 23, 2015) ("expert vocation testimony given in response to hypothetical questions that do not present the full extent of claimants' impairments, limitations[,] and restrictions … cannot constitute substantial evidence to support a conclusion of no disability"). In such circumstances, the ALJ's decision may be upheld only if the error was "harmless," that is, if other "substantial evidence in the record" supports the ALJ's conclusions. *See McIntyre*, 758 F.3d at 152; *cf. Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008).

Here, the ALJ fully described Hernandez's residual functional capacity to Matzilevich with respect to Hernandez's depressive and anxiety disorder. The ALJ found that Hernandez was limited to occasional "interation with coworkers, supervisors, or the general public." ALJ Decision, R. at 14. In posing the hypothetical to Matzilevich, the ALJ asked him to "assume an individual of [Hernandez]'s age, education, and past relevant work experience, who is limited to the sedentary exertion[] level … [and can have] only occasional interaction with coworkers, with the public, and with the supervisors." Tr. of ALJ Hr'g, R. at 63-64. It is clear from the record

that those limitations stem from Hernandez's claimed mental impairments, rather than her physical impairments. *See, e.g.,* Int'l Disability Determination Explanation, R. at 78-79; Reconsideration Disability Determination Explanation, R. at 104-105; Treatment Note by Dr. Anderson, R. at 344-346. Further, in a different hypothetical, the ALJ asked Matzilevich to assume that a claimant was "unable to complete tasks from beginning to end on a consistent basis, and [was] unable to maintain competitive pace for more than 80 percent of the time in the work place." Tr. of ALJ Hr'g, R. at 63. Again, it is clear from the record that those limitations stem from Hernandez's claimed mental impairments, rather than her physical impairments. *See, e.g.,* Int'l Disability Determination Explanation, R. at 78-79; Reconsideration Disability Determination Explanation, R. at 104-05; Treatment Note by Dr. Anderson, R. at 344-46. Hernandez's claim that the ALJ's hypothetical question to the vocational expert was "defective" because it did not include any limitations "whatsoever" resulting from Hernandez's mental impairments, is therefore unavailing. Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 39.

The ALJ did, however, err in not asking Matzilevich to consider Hernandez's kidney stones as a possible limitation. As noted in Section III(C) of this opinion, the ALJ, in making his step two determination, should have considered Hernandez's kidney stones and made a determination concerning the severity of the impairment and its impact on her physical and mental ability to perform basic work activities. Hernandez's kidney stones were a limitation supported by the record, and the ALJ failed to consider whether they limited her functional abilities in any way. Accordingly, the hypothetical did not "include all of the claimant's function limitations … supported by the record" and, therefore, cannot be considered reliable. *Horbock*, 210 F. Supp. 2d at 134.

## IV.     Conclusion

For the reasons set forth above, I DENY the Commissioner's Motion to Affirm its Decision (Doc. No. 27), and GRANT Hernandez's Motion to Reverse the Decision of the Commissioner (Doc. No. 21).  I remand for further development of the record with respect to Hernandez's kidney stone impairment and with respect to the number of jobs in the national economy available to Hernandez.

The Clerk shall enter judgment, effect remand to the Commissioner, and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 29th day of March 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge